850 F.2d 79
 Arthur J. GIACALONE, Plaintiff-Appellee,
v.
Robert ABRAMS, Attorney General of the State of New York,
Hugh B. Scott, Former Assistant Attorney General in Charge
of Buffalo Office of State of New York's Department of Law,
Dennis H. Allee, Peter L. Yellin and Richard Rifkin,
Defendants-Appellants.
 No. 686, Docket 87-7866.
 United States Court of Appeals,
Second Circuit.
 Argued March 8, 1988.
Decided June 21, 1988.
As Amended on Denial of Rehearing Aug. 17, 1988.
 
 Michael S. Buskus, Asst. Atty. Gen., State of N.Y., Albany, N.Y. (Robert Abrams, Atty. Gen. of the State of N.Y., O. Peter Sherwood, Sol. Gen., Peter H. Schiff, Deputy Sol. Gen., Albany, N.Y., of counsel), for defendants-appellants.
 John N. Lipsitz, Buffalo, N.Y., for plaintiff-appellee.
 Before MESKILL and ALTIMARI,* Circuit Judges, and MISHLER, District Judge.**
 MESKILL, Circuit Judge:
 
 
 1
 Plaintiff-appellee Arthur J. Giacalone brought this action under 42 U.S.C. Sec. 1983 (1982) seeking damages and reinstatement to his former position as an Assistant Attorney General in the New York State Department of Law (the Department). He alleged that the named defendants, who include his former immediate superior Hugh B. Scott and other Department officials, decided to terminate him in December 1982 because he had engaged in speech protected by the First Amendment. Both sides moved for summary judgment.
 
 
 2
 The United States District Court for the Western District of New York, Elfvin, J., ordered dismissal of one claim as to three defendants, including Attorney General Robert Abrams, with respect to whom Giacalone had not alleged any personal involvement in the purportedly unlawful conduct covered by the claim. The court denied the motion for dismissal on that claim as to defendants Scott and First Assistant Attorney General Peter L. Yellin, holding that Giacalone had "at least facially" stated a claim against them. The court also concluded that the speech in question touched on a matter of public concern and granted partial summary judgment for Giacalone to that extent. Finally, the court denied the defendants' motion to dismiss on grounds of qualified immunity, holding that the First Amendment implications of their conduct were clearly established.
 
 
 3
 The defendants bring this interlocutory appeal from the district court's denial of their claims of qualified immunity. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); Musso v. Hourigan, 836 F.2d 736, 740 (2d Cir.1988). For reasons that follow, we conclude that the law with respect to Giacalone's First Amendment claims was not clearly established and that the district court therefore erred in denying the motions to dismiss on the basis of qualified immunity. We accordingly reverse and remand with directions to dismiss the action insofar as it seeks damages from the defendants individually.
 
 BACKGROUND
 
 4
 We set forth the facts of this case in some detail because they are crucial to our analysis of the qualified immunity issue. We summarize undisputed or uncontradicted facts and, because this case comes to us on appeal from denial of a summary judgment motion, note the areas of material dispute.
 
 
 5
 From August 1981 to December 1982, Giacalone was an Assistant Attorney General in the Buffalo Regional Office of the Department of Law. He had earned "superior" performance evaluation ratings in this position. Defendant Scott, his immediate superior, was the Assistant Attorney General in charge of the Buffalo office. Scott's immediate superior was Deputy First Assistant Attorney General Yellin. The other named defendants were Yellin's immediate superior, First Assistant Attorney General Dennis H. Allee, Deputy First Assistant Attorney General Richard Rifkin, and Attorney General Abrams.
 
 
 6
 One of the matters assigned to Giacalone involved the failure of two corporate employers, Norton Laboratories, Inc. and Auburn Plastics, Inc., to pay their employees in conformity with state law. At issue were wages and benefits due for a three week period in 1981 immediately before the corporations ceased doing business. Giacalone negotiated and drafted a settlement agreement under which individuals connected with the corporate employers paid back wages and benefits to the Department for disbursement to the workers. The first installment of $230,751.85 was paid in November 1981, and the first checks were distributed to the workers the following month. The Department issued a press release, prominently captioned "News from Attorney General Robert Abrams," to announce the receipt and distribution of the settlement proceeds. The Attorney General himself appeared at the public presentation of checks to employees. The Department of Law received the second and final installment of $15,868.57 on May 25, 1982. The Attorney General issued a press release stating that the funds would be distributed to the workers "in approximately 30 days."
 
 
 7
 A dispute arose, however, over the withholding of federal income taxes from the settlement proceeds. Although the Department withheld amounts to satisfy FICA obligations, it did not withhold income taxes. The Department and the individual parties to the settlement disclaimed responsibility for income tax withholding. The Department informed recipients by letter that their distributions might constitute taxable income for the year 1981. The controversy was compounded on June 23, 1982, when the Department received a letter from Internal Revenue Service (IRS) Acting District Counsel Edward D. Fickess. The letter apprised the Department of the IRS' position that the Department "had a duty to withhold all wage [as well as] FICA taxes." Fickess warned that "the state of New York and the individuals who actively worked [on] this case" could be liable for the unpaid taxes.
 
 
 8
 In response, Giacalone drafted a memorandum summarizing the case and analyzing applicable provisions of the Internal Revenue Code. He concluded that the IRS' position was "unsupportable." J.App. at 738. Nevertheless, he recommended delaying distribution of the second installment until the controversy over withholding liability could be resolved. Id. at 749. Because of the Department's lack of tax expertise, however, Scott obtained the assistance of Rochester attorney Sydney Rubin, a tax specialist. Rubin assumed primary responsibility for handling the matter and worked with Scott and Giacalone in late August 1982 to prepare for a meeting with Fickess on September 2.
 
 
 9
 The September 2 meeting and events leading up to it precipitated the incidents on which this suit is based. Giacalone alleges that in the days preceding the meeting, Scott expressed a desire to devise a strategy to keep the IRS dispute quiet or stalled until after the November 2, 1982 election in which Abrams was up for reelection. Scott disputes this characterization and maintains that he only said he hoped the matter would not "blow up" before the election.
 
 
 10
 Giacalone went into the September 2 meeting believing that he, Scott and Rubin had agreed to take the position that the Department was not liable for tax withholding and would distribute the funds. At the meeting, however, Rubin agreed to delay distribution of the second installment until the witholding issue could be straightened out, in case the Department should turn out to be liable. Scott added that no final decision could be made until the New York State Department of Labor was consulted. On September 21, Scott wrote a memorandum to Rifkin explaining this decision. The memorandum stated that although the Department of Law still took the position that the state was not responsible for withholding, "there is, according to Sidney [sic] Rubin, some room for interpretation of the term 'employer' under the Code...." Therefore, wrote Scott, "Mr. Rubin recommends, and I concur, that ... the $16,000 now being held ... should continue to be held until we can resolve the issue...." J.App. at 1235. In early October, the Department of Labor's Division of Labor Standards accepted the Department of Law's direction to hold the final installment until advised further by the Attorney General's office. See J.App. at 1242.
 
 
 11
 Giacalone was dismayed that Rubin had agreed to delay disbursements from the second installment. He perceived the decision as a failure to act in the best interests of the workers, in violation of the Department of Law's ethical obligations. Immediately after the September 2 meeting, he expressed to Scott the belief that withholding the money from the workers might be unethical and without authority in law. He also reiterated his belief that the state had no legal obligation to withhold the taxes. He offered to do further research and to draft a memorandum detailing his conclusions as to these concerns. Giacalone contends that he also suggested notifying the workers of the reason for the delay, and that Scott "flatly prohibited" such notification and indicated that the IRS investigation must not be made public. Giacalone also alleges that Scott consulted with Yellin and then prohibited Giacalone from putting the results of his research on these matters into a memorandum or any other written form. Scott explains that he considered the preparation of a memorandum on this subject unnecessary because Rubin had presumably taken into consideration the concerns Giacalone sought to address.
 
 
 12
 The matter lay dormant until early November, when Giacalone received calls from workers who wanted to know why proceeds from the second installment still had not been distributed. Giacalone consulted with Scott, who allegedly replied that Giacalone should "tell them we lost the money." Scott concedes that he "might have [made that remark] in a humorous moment." Giacalone then drafted a memorandum expressing concern that no distributions had been made despite the passage of almost six months since receipt of the final installment. The memorandum stated that Giacalone believed it to be "imperative that our office, in conjunction with the Department of Labor, take immediate steps to release the funds." On November 9, he dispatched this memorandum (the November memorandum) to Scott, Yellin and Allee.
 
 
 13
 Upper echelons in the Department of Law reacted unfavorably to Giacalone's memorandum. Rifkin, to whom Allee referred the matter, was particularly irked by Giacalone's presumptuousness in circulating the memo over the head of his immediate superior, Scott. See J.App. at 1049-50. Scott communicated this reaction, as well as his own displeasure, to Giacalone. See J.App. at 278-79. As a result of this reaction, Giacalone began to contemplate what he would do in the event he was fired. He talked the matter over with several colleagues in the Buffalo Regional Office. Scott heard "from two and three different directions" that Giacalone was considering "going public." J.App. at 262. Giacalone admits stating to colleagues that his options included legal action and resort to the media.
 
 
 14
 On December 3, Giacalone again raised his concerns with Scott and asked permission to contact Rubin directly. According to Giacalone, Scott responded in an angry and defensive manner and accused Giacalone of attempting to harm his reputation. See J.App. at 521-22. Giacalone memorialized this meeting in the following memorandum to Scott dated December 6, 1982 (the December memorandum).
 
 Dear Hugh:
 
 15
 To assure that there are no misunderstandings, I am sending you this letter to reiterate the three points I stated at the beginning of our conversation last Friday, December 3:
 
 
 16
 1. Inquiries continue to be made regarding the timing of disbursement of the second installment of the Norton Laboratories monies, and at least one of the former workers claims to be in desperate need of the money that is owed to him.
 
 
 17
 2. As I expressed to you in September ... I am concerned that the State's failure to disburse the monies may not be authorized by law, and that the Department of Law may be acting unethically. (I regret that I have been prohibited from addressing these concerns in a legal memorandum.)
 
 
 18
 3. If appropriate action regarding the second installment is not taken within the next three weeks, I am seriously considering providing you with my notice of resignation by the end of this month.
 
 
 19
 Very truly yours,
 
 
 20
 /s/ Arthur J. Giacalone
 
 
 21
 J.App. at 1239. Scott passed the memorandum on to Yellin, who referred it in turn to Allee along with a memorandum stating that "There is no question in my mind that Rubin['s strategy] is right on target in this case and [that he] has handled a difficult situation extremely well for the Department." J.App. at 1240. Yellin added that the tone of the December memorandum "suggests that attention should be given as to whether [Giacalone] should remain with the Department of Law." Id. Allee wrote to Rifkin, characterizing the matter as "extremely serious" and stating that he could not "tolerate this kind of threatening and unprofessional conduct." He directed Rifkin to "review the situation carefully with Yellin and Scott, who are quite upset, and adivse [sic] me whether Giacalone can be salvaged." Id. at 1241.
 
 
 22
 Attorney General Abrams and the Department's Executive Committee met in New York City on Friday, December 10. After discussion of Giacalone's record in general and his conduct in the Norton Labs/Auburn Plastics matter in particular, Abrams accepted the Committee's recommendation that Giacalone be terminated. His decision was communicated to Scott, leaving the details of termination to Scott's discretion. On December 15, Scott called Giacalone into his office and asked Giacalone to make good on his offer to resign. When Giacalone refused, Scott handed him a two sentence letter terminating him "effective immediately."
 
 
 23
 In the aftermath of his firing, Giacalone met with Allee. Giacalone states that Allee told him that the alleged threat to go public was a "significant factor" in the Executive Committee's decision to recommend termination. Other participants in the decision to terminate Giacalone were also influenced by the inappropriateness of Giacalone's "threat" to resign if he did not prevail in his campaign to have the payments released. See J.App. at 1108 (Allee deposition); id. at 1053 (Rifkin deposition).
 
 
 24
 In late January 1983, Rubin reached an understanding with the IRS that settled the withholding controversy. The second installment was distributed to the workers in July 1983. The Department withheld federal income taxes from the payments. See J.App. at 127-28; 139-41.
 
 
 25
 On January 27, 1983, Giacalone submitted a grievance to the Grievance Committee of the Fourth Judicial Department alleging ethical misconduct on Scott's part in the handling of the dispute with the IRS. See J.App. at 648. The Grievance Committee replied on April 12, 1983, that it had reviewed the allegations and had decided to close the file after finding "no unprofessional conduct on the part of any of the Respondents [sic] named in your complaints [sic]." J.App. at 1641.
 
 
 26
 On December 19, 1983, Giacalone commenced this action.
 
 I.
 
 27
 As a threshold matter, we must address a jurisdictional issue of first impression in this Circuit. Giacalone contends that we lack jurisdiction over this interlocutory appeal from the district court's denial of claims of qualified immunity because his complaint seeks the equitable remedy of reinstatement as well as damages. He argues that even if the defendants are relieved of the burden of litigating their own liability for damages, they will still be obliged to proceed to trial on his equitable claim. Giacalone cites Bever v. Gilbertson, 724 F.2d 1083, 1087-88 (4th Cir.), cert. denied, 469 U.S. 948, 105 S.Ct. 349, 83 L.Ed.2d 285 (1984), which held that a denial of a qualified immunity claim is not immediately appealable in such circumstances.
 
 
 28
 In Mitchell v. Forsyth, the Supreme Court held that a district court's denial of a claim of qualified immunity is appealable before final judgment. See 472 U.S. at 530, 105 S.Ct. at 2817. The Mitchell Court did not address the appealability of denials of immunity in cases that involve claims for injunctive relief as well. See id. at 519 n. 5, 105 S.Ct. at 2811 n. 5. Decisions in the wake of Mitchell have uniformly rejected Bever 's reasoning, however. See Drake v. Scott, 812 F.2d 395, 398 & n. 3 (8th Cir.), modified on other grounds on rehearing, 823 F.2d 239 (8th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987); Kennedy v. City of Cleveland, 797 F.2d 297, 306 (6th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987); De Abadia v. Izquierdo Mora, 792 F.2d 1187, 1189-90 (1st Cir.1986). Cf. Musso, 836 F.2d at 742 n. 1.
 
 
 29
 We do not find the Bever Court's analysis persuasive because it is at odds with the rationale underlying the qualified immunity doctrine. The Supreme Court has made it clear that qualified immunity is an "entitlement not to stand trial or face the other burdens of litigation." Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815. As the Court stressed in Mitchell, "[t]he entitlement is an immunity from suit rather than a mere defense to liability; and ... it is effectively lost if a case is erroneously permitted to go to trial." Id. Denials of claims of qualified immunity in suits for damages must be immediately appealable in order to protect these important interests. Id. at 526-27, 105 S.Ct. at 2815-16.
 
 
 30
 When a plaintiff seeks both damages and equitable relief, successful assertion of qualified immunity frees an official only from the burden of defending against personal liability for damages. The official still must participate in the ongoing suit to litigate the remaining equitable claims. Nevertheless, the burden of defending such claims in an official capacity is less than the burden of defending damages claims in a personal capacity. If the official cannot obtain an immediate appeal of a denial of qualified immunity in such circumstances, he or she is saddled with the more onerous burden of defending against personal liability and the "immunity from suit" stressed in Mitchell is effectively lost.
 
 
 31
 The Bever approach rests on the implicit assumption that the burden of defending a suit for equitable relief in an official capacity is no less than the burden of defending against personal liability for damages. See Bever, 724 F.2d at 1088. Cf. De Abadia, 792 F.2d at 1189; Bever, 724 F.2d at 1091 n. 4 (Hall, J., dissenting). We do not agree. The significantly different burden of defending against individual liability squarely implicates the underpinnings of qualified immunity by "distract[ing] officials from their governmental duties, inhibit[ing] discretionary action, and deter[ring] able people from public service," Harlow v. Fitzgerald, 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982). Furthermore, adoption of the Bever view would allow plaintiffs to avoid immediate appellate review of denials of qualified immunity simply by including equitable claims in their complaints. See De Abadia, 792 F.2d at 1190; Bever, 724 F.2d at 1091 (Hall, J., dissenting). The Bever approach thus has considerable potential for eroding the policies of qualified immunity that supported the Mitchell Court's holding that denials should be appealable, see 472 U.S. at 525-26, 105 S.Ct. at 2814-15.
 
 
 32
 We hold that a denial of a claim of qualified immunity is immediately appealable under the circumstances defined in Mitchell even when a plaintiff seeks equitable relief as well as damages. Accordingly, we deny Giacalone's motion to dismiss this appeal and proceed to the merits.
 
 II.
 
 33
 It is well settled that executive officials enjoy immunity from liability for damages if their actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. "[I]n the light of preexisting law the unlawfulness [of the action in question] must be apparent." Anderson v. Creighton, --- U.S. ----, ----, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). In this interlocutory appeal, we decide only a narrow question of law: "whether the legal norms allegedly violated by the defendant[s] were clearly established at the time of the challenged actions." Mitchell, 472 U.S. at 528, 105 S.Ct. at 2816. In the context of a summary judgment motion, we also must view the record most favorably to Giacalone, as the party opposing the motion, see United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam), and "accept [his] account of the reasons for his dismissal," Hawkins v. Steingut, 829 F.2d 317, 319 (2d Cir.1987). See also Mitchell, 472 U.S. at 528-29 & n. 9, 105 S.Ct. at 2816-17 & n. 9.
 
 
 34
 To determine whether a public employee's First Amendment rights have been violated, a court balances "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968). See also Rankin v. McPherson, --- U.S. ----, ----, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987); Connick v. Myers, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983); Givhan v. Western Line Consolidated School District, 439 U.S. 410, 414, 99 S.Ct. 693, 696, 58 L.Ed.2d 619 (1979); Mount Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977). In evaluating the relative weight of the employer's and employee's interests, we also "consider whether the speech impaired the employee's ability to perform his duties, disrupted working relationships requiring personal loyalty and confidence, or otherwise impeded the regular operation of the employing agency." Rookard v. Health and Hospitals Corp., 710 F.2d 41, 46 (2d Cir.1983) (citing Pickering, 391 U.S. at 569-70, 572-73, 88 S.Ct. at 1734-35, 1736-37).
 
 
 35
 The district court erred when it concluded that the claims of qualified immunity should be denied because the Pickering line of cases clearly established that "a public employee retains First Amendment rights and ... may not generally be discharged for the exercise of those rights." J.App. at 1288. This formulation of the principle, albeit correct, is too general to be controlling in the qualified immunity inquiry. For that purpose, "the right ... alleged to have [been] violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, --- U.S. at ----, 107 S.Ct. at 3039 (emphasis added). The inquiry therefore does not stop at the level of the abstract rule on which the district court relied. Qualified immunity analysis requires the court to consider the operation of the rule in the context of "the circumstances with which [the official] was confronted," id.
 
 
 36
 Giacalone essentially claims that he was terminated for expressing doubts about the ethical and legal correctness of the Department of Law's handling of the dispute with the IRS. He also alludes to Department officials' allegedly improper reliance on political concerns in the formulation of policy,but he does not allege that he ever expressed an opinion on this point. It is undisputed that Giacalone's opinions on these matters differed from those of his superiors, and that those differences led him to take actions that met with stern disapproval at higher levels in the Department of Law.[1]
 
 
 37
 Thus, the proper inquiry in this case is whether the law defined by Pickering and the cases following it was "clearly established" in late 1982 such that Giacalone's superiors could reasonably have anticipated that their conduct would violate his First Amendment rights. Specifically, we must decide whether it would have been apparent to a reasonable superior that Giacalone's interest in expressing his views on legal and ethical concerns raised by the Department's handling of the tax dispute outweighed the Department's interest in the efficient and orderly conduct of its business. Even accepting Giacalone's account of his dismissal, we conclude that the Pickering balance did not tip in his favor so clearly that his superiors can properly be said to have forfeited their qualified immunity.
 
 III.
 
 38
 In determining whether First Amendment law governing Giacalone's claim was clearly established in 1982, we must initially decide whether his speech touched on a matter of public concern. If it did not, it does not enjoy First Amendment protection. See American Postal Workers Union, AFL-CIO v. United States Postal Service, 766 F.2d 715, 721 (2d Cir.1985), cert. denied, 475 U.S. 1046, 106 S.Ct. 1262, 89 L.Ed.2d 572 (1986). The test is whether, as a matter of law, "the content, form and context of a given statement, as revealed by the whole record," constitute speech on a matter of public concern. See Connick, 461 U.S. at 147-48 & n. 7, 103 S.Ct. at 1690 & n. 7. See also Rankin, --- U.S. at ----, 107 S.Ct. at 2897.
 
 
 39
 Giacalone allegedly expressed concern that the litigation strategy formulated by Department officials was legally unauthorized and ethically improper. Although this presents a close question, we believe that his comments did touch on matters of colorably public concern, and that this dimension of his speech would have been apparent to reasonably informed superiors in December 1982. Cf. Connick, 461 U.S. at 149, 103 S.Ct. at 1691 (noting "demonstrated" public interest in speech concerning political pressure exerted on assistant district attorneys); Rookard, 710 F.2d at 46 (allegation of "corrupt and wasteful practices ... obviously involves a matter of public concern"). In addition, the Department's own efforts to publicize the settlement and disbursement of funds to workers bespeak the public interest value of the underlying dispute. For the purposes of this appeal, we therefore assume that Giacalone's comments addressed a matter of public concern. We now consider how his First Amendment interest in making those comments weighs in the Pickering balancing test.
 
 A.
 
 40
 The relation of Giacalone's speech to a matter of public concern is only a threshold issue that establishes that he had some First Amendment interest at stake. With respect to the weight to be accorded that interest, "Pickering unmistakably states ... that the State's burden in justifying a particular discharge varies depending on the nature of the employee's expression." Connick, 461 U.S. at 150, 103 S.Ct. at 1691-92. In this case, the nature of Giacalone's comment suggests that his First Amendment interests were entitled to comparatively little weight.
 
 
 41
 Giacalone's most disturbing allegation is that the IRS investigation was somehow hushed up to protect Abrams' political interests. Significantly, however, Giacalone never raised this point with his superiors. His emphasis on Scott's purported political motivation is therefore off the mark because the Pickering balancing test looks to the employee's interest in speaking. Abstract concern about a particular subject carries no weight if the employee chooses not to articulate it.
 
 
 42
 The concerns Giacalone did express to Scott reflected only differences of opinion over the conduct of the dispute with the IRS. As to the substance of that dispute, Giacalone merely disagreed with Rubin on the legality of retaining the money pending resolution of the dispute. There was room for legitimate difference of opinion on this point, however. Indeed, despite Giacalone's later insistence on prompt release of the funds to the workers, he himself initially advised that payment be delayed until the withholding issue could be clarified. See J.App. at 749. His own change of mind suggests that the Department was simply pursuing a strategy it believed to be legally meritorious.
 
 
 43
 Giacalone's allegations of ethical impropriety fare little better. He characterizes Scott's insistence on consulting with the Department of Labor as a stalling tactic, see J.App. at 535, but also makes the inconsistent argument that the Department of Law's alleged failure to initiate such consultation was an ethical violation.[2] He also alleges that the failure to disburse the settlement proceeds constituted a failure to act in the workers' best interests. He does not explain, however, how the Department of Law could ethically disregard the interests of the Department of Labor, which was more directly a "client" of the Department of Law and which was also at risk of being saddled with withholding liability. Giacalone's inability to steer a steady course through these issues indicates that they were debatable and complex, and that his comments concerned legitimate differences of legal opinion.[3]
 
 
 44
 Giacalone thus had a First Amendment interest in expressing his views on matters of law and legal ethics as to which there was ground for difference of opinion. His interest in being able to speak on these concerns, though legitimate, was of a distinctly lesser order of magnitude than it might have been if he had raised the more serious allegation that Scott and Yellin were participating in some sort of coverup. Cf. Connick, 461 U.S. at 148, 103 S.Ct. at 1691 (noting that employee's comment had not sought to reveal "actual or potential wrongdoing or breach of public trust").
 
 B.
 
 45
 We turn now to the state's interest in efficient performance of its public services. Pickering suggests that maintenance of discipline and preservation of close working relationships involving personal loyalty or confidence can be relevant to the employer's interest. See 391 U.S. at 570, 88 S.Ct. at 1735. See also Givhan, 439 U.S. at 414 n. 3, 99 S.Ct. at 696 n. 3; Rookard, 710 F.2d at 46. The significant adverse effect of Giacalone's actions on his relationship with Scott plainly implicates these concerns. The effect of this friction on office discipline was probably minimal because Giacalone largely expressed his frustrations to Scott in private. Even in such a personal confrontation, however, "the employing agency's institutional efficiency may be threatened ... by the manner, time, and place in which [the employee's message] is delivered." Givhan, 439 U.S. at 415 n. 4, 99 S.Ct. at 696 n. 4. Particularly after Giacalone sent the November memorandum outside the chain of command and delivered the confrontational December memorandum, Scott could hardly count on him to abide by and carry out Department policy. Moreover, the strong negative reaction to Giacalone's conduct from upper levels of the Department indicates that his actions were viewed as disruptive and inimical to the Department's mission.
 
 
 46
 Giacalone's purported threat to "go public" should not be given great evidentiary weight in evaluating the decision to terminate him. Termination is far more likely to cause an employee to "go public" than to silence him or her. The Department apparently regarded this threat as just one manifestation of "threatening and unprofessional conduct." See J.App. at 1241. Giacalone's superiors appeared to be most disturbed by his insubordinate insistence on having his conclusions control the handling of the tax dispute.
 
 
 47
 Giacalone also contends that his First Amendment rights were violated by Scott's refusal to allow Giacalone to contact the workers to explain the delay or to write a memorandum on the results of his research. In context, it is difficult to read much into this prohibition. Although it implicates Giacalone's interest in speaking out on the subject, it is also consistent with the decision to place the matter in the hands of outside counsel. Under these circumstances, we do not think it weighs on either side of the Pickering balancing test.
 
 
 48
 For purposes of the qualified immunity issue, we need to answer only the limited question of whether it should have been apparent to Giacalone's superiors that his discharge violated his First Amendment rights. We conclude that it was not clearly established in December 1982 that Giacalone's discharge under the circumstances constituted a First Amendment violation. The Pickering balancing test and decisions construing it at that time would more likely have suggested to Giacalone's superiors that his limited First Amendment interest was outweighed by the disruption his action fostered. Cf. Connick, 461 U.S. at 154, 103 S.Ct. at 1694. The record does not support the conclusion that their actions were unlawful, let alone that "in the light of preexisting law the unlawfulness [would have been] apparent," Anderson, --- U.S. at ----, 107 S.Ct. at 3039.
 
 CONCLUSION
 
 49
 We hold that the defendants are immune from individual liability for damages. The decision of the district court is therefore reversed and the case remanded with instructions to dismiss the action to the extent Giacalone seeks damages from these defendants, and for further proceedings consistent with this opinion.
 
 
 
 *
 Judge Altimari recused himself from consideration of this appeal. Judges Meskill and Mishler are in agreement and therefore render decision pursuant to Second Circuit Rule Sec. 0.14(b)
 
 
 **
 Honorable Jacob Mishler, United States District Judge for the Eastern District of New York, sitting by designation
 
 
 [1]
 Apparently Giacalone does not challenge the district court's finding that he failed to show Abrams', Rifkin's or Allee's personal involvement in forbidding Giacalone to draft a memorandum detailing his concerns. In the absence of such involvement, they cannot be held liable for damages under Sec. 1983 based on this alleged incident. See Gill v. Mooney, 824 F.2d 192, 196 (2d Cir.1987). To the extent that the district court left standing the claims against these defendants based on their roles in the decision to terminate Giacalone, our discussion of the qualified immunity analysis applies to them as well
 
 
 [2]
 Giacalone also criticizes the Department of Law for failing to consult with the Department of Labor before reaching a "final" decision to delay payment of the second installment. Uncontradicted documentary evidence discloses, however, that the decision was in fact communicated to and approved by the Department of Labor. Giacalone's complaint is thus reduced to an assertion that the decision was represented to him as final before it was cleared with the Department of Labor. He does not contend that this flaw by itself constitutes an ethical or legal defect
 
 
 [3]
 The weight to be accorded Giacalone's speech on ethical concerns is further diminished by the Grievance Committee's decision to close the file on his complaint against Scott. This disposition, albeit not controlling, certainly supports an inference that there was room for legitimate difference of opinion on the subjects of Giacalone's concern