952 F.2d 661
 Antonino T. DiMARCO, M.D., Plaintiff-Appellee, Cross-Appellant,
v.
ROME HOSPITAL AND MURPHY MEMORIAL HOSPITAL, the Board of
Managers of Rome Hospital and Murphy Memorial Hospital, Kirk
B. Hinman, Henry A. Sparks, M.D., Medical Director of Rome
Hospital and Murphy Memorial Hospital, John A. Gorman, Chief
Executive Officer of Rome Hospital and Murphy Memorial
Hospital, HCA Management Company, Incorporated, Charles M.
Brown, M.D., James D. Dunda, M.D., Neville W. Harper, M.D.,
Lawrence Burgreen, M.D., and Herb Skogland, M.D.,
Defendants-Appellants, Cross-Appellees.
 Nos. 500, 501, 502 and 637, Dockets 91-7725, 91-7747,
91-7777 and 91-7779.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 22, 1991.
Decided Jan. 2, 1992.
 
 Leonard M. Rosenberg, Great Neck, N.Y. (Marialana M. Gravano, Garfunkel, Wild & Travis, P.C., of counsel), for defendants-appellants, cross-appellees Rome Hosp. and Murphy Memorial Hosp., Bd. of Managers of Rome Hosp. and Murphy Memorial Hosp., Kirk B. Hinman, and Henry A. Sparks, M.D.
 James O'Shea, Syracuse, N.Y. (Michael P. Ringwood, Smith, Sovik, Kendrick, Schwarzer & Sugnet, P.C., of counsel), for defendants-appellants, cross-appellees Charles M. Brown, M.D., James D. Dunda, M.D., Neville W. Harper, M.D., Lawrence Burgreen, M.D., and Herb Skogland, M.D.
 Michael J. Hutter, Albany, N.Y. (Barry A. Gold, Dominique A. Pollara, Thuillez, Ford, Gold & Conolly, of counsel), for defendants-appellants, cross-appellees John A. Gorman and HCA Management Co., Inc.
 Jules L. Smith, Rochester, N.Y. (Steven V. Modica, Blitman & King, of counsel), for plaintiff-appellee, cross-appellant Antonino T. DiMarco, M.D.
 Before PRATT, MAHONEY and McLAUGHLIN, Circuit Judges.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 The defendants, a hospital and its various managers and administrators, appeal from the denial of their motion for summary judgment based on the defense of qualified immunity. All parties ask us to invoke our pendent appellate jurisdiction, see, e.g., San Filippo v. U.S. Trust Co. of New York, 737 F.2d 246, 255 (2d Cir.1984), cert. denied, 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985), in order to reach other claims. Because we conclude that resolution of the qualified immunity defense involves questions of both law and fact, we dismiss the appeal. We decline to exercise pendent appellate jurisdiction over the other issues advanced on defendants' appeal, and we dismiss the cross-appeal as well.
 
 FACTS AND BACKGROUND
 
 2
 Dr. Antonino DiMarco joined the active medical staff of Rome Hospital and Murphy Memorial Hospital (which, despite its name, is one hospital) in 1978, and was granted certain medical privileges. One of these privileges was "esophageal dilation", a procedure in which a flexible tube is inserted through the mouth in order to expand the esophagus. This procedure allows the insertion of a medical instrument, and may also be used to relieve excessive closure or restriction. This procedure is not performed very often (26 times by all doctors at the hospital in 1990), although DiMarco himself has performed esophageal dilation over 20 times in a seven-year period.
 
 
 3
 From 1979 to 1985, all of DiMarco's privileges were routinely reviewed, and he was "recredentialed" each year without any restrictions. In 1985, DiMarco shared some of his concerns regarding patient care with the New York State Department of Health (DOH). After a comprehensive investigation into the hospital's operations, the DOH found the hospital deficient in a number of areas, confirming many of the problems that DiMarco had identified. In response to the DOH findings, the hospital promulgated a "Plan of Correction", which included an agreement to review and reevaluate the credentials of its professional staff.
 
 
 4
 In 1986, DiMarco once again applied to have his privileges renewed and to be reappointed to the medical staff of the hospital. The hospital's credentials committee met (belatedly, it appears) on March 23, 1987, and renewed all of DiMarco's clinical privileges, except the privilege to perform esophageal dilation. The hospital claims that the endoscopy committee met in January 1987, and determined that esophageal dilation privileges would be limited to those physicians who had reached the highest level of privileges in gastroenterology (simultaneously implying that DiMarco had simply not attained this level of expertise). DiMarco, on the other hand, claims that the denial of this privilege was part of the hospital's retaliation against him for "blowing the whistle" to DOH. The credentials committee's minutes reflect only that the privilege was "withheld on advice from Dr. Roy."The credentials committee reassembled on April 20, 1987, in order to review eight "incidents" (defined by the hospital as "any happening which is not consistent with the routine operation of the hospital or the routine care of a particular patient", including "an accident or a situation which may result in an accident") involving DiMarco. After reviewing these incidents, the credentials committee voted to continue DiMarco's privileges (with the continued exception of esophageal dilation privileges). The following chart briefly recounts these incidents, as summarized by the credentials committee's chart:
 
 
 5
 Date Incident Conclusion Action taken
11/27/84 Improper transfer of Poor judgment Letter of admonition
 patient to ICU
12/2/84 Disagreement between Lack of Letter of admonition
 DiMarco and nurse professional
 performance
3/10/86 Disagreement between Lack of Letter to Executive
 DiMarco and nurse professional Committee
 performance
5/29/86 Breach of patient Refused to respond Reported to Executive
 confidentiality to chairman of Committee, no
 medical corrective action
 department
7/23/86 Streptokinase therapy Poor judgment Letter to file
9/17/86 Disruption of medical Meeting cancelled; Reported to Executive
 department meeting later reconvened Committee, no
 corrective action
1/17/87 Delay in responding to Delay occurred Monitor consultations
 consultation request
3/10/87 Inadequate orders for ICU Unprofessional Letter of admonition
 patient behavior
----------
 
 
 6
 DiMarco, not surprisingly, draws different conclusions regarding his behavior at the time of these incidents, construing most of them as necessary to further the interests of patient care. He points out that the DOH, through its office of Professional Medical Conduct (OPMC), investigated all of these incidents (with the exception of the meeting interruption). Following each investigation, OPMC concluded that DiMarco had not engaged in any misconduct. DiMarco further submitted a signed statement from Rita Hoffman (the nurse involved in the March 10, 1986 incident), which stated that DiMarco's conduct on that occasion was justified by the situation, and that DiMarco's conduct in her presence had been "fine" otherwise.
 
 
 7
 On November 20, 1987, DiMarco was notified that the Board of Managers had accepted the executive committee's recommendation that he be reappointed to the medical staff--but again with strings attached. DiMarco was informed that his professional mien would be monitored for a probationary period "with respect to [his] obligation to work in a cooperative supportive manner with members of the medical and nursing staff." Later, this monitoring period was extended for an additional year. Although his esophageal dilation privileges had originally been denied in 1987, DiMarco was first informed of this development in April 1988.
 
 
 8
 By letter dated August 31, 1989, the hospital informed DiMarco that his hospital privileges were suspended for 90 days. Also, "effective immediately, [DiMarco's] professional demeanor and behavior should be monitored on a weekly basis with weekly meetings with [DiMarco, the hospital's CEO], the director of nursing, medical director and the chairman of the Department of Medicine." DiMarco's hospital activities were to be monitored and monthly reports sent to the executive committee. The suspension, according to the letter, was "based on a determination by the Executive Committee that you have repeatedly violated the terms of your probation, and in particular, your unprofessional demeanor and continuing course of inappropriate and disruptive behavior."
 
 
 9
 DiMarco exercised his right (conferred by the hospital bylaws) to a hearing, and on December 22, 1989, the hospital's "Fair Hearing Committee" reached the following decisions:
 
 
 10
 1. On the basis of information provided the Committee during the Hearing regarding the Emergency Room incident on 12-28-88, [DiMarco] was found in violation of [the Medical Staff Bylaws].
 
 
 11
 2. Resultant from violations of the Bylaws punition is warranted.
 
 
 12
 3. This punition shall be recommended as follows:
 
 
 13
 Implementation of suspension of [DiMarco] be imposed contingent upon his non-compliance with the stipulations noted below (the duration of the suspension, if any required, is to be determined in a subsequent report):
 
 
 14
 a. [DiMarco] must submit a written statement of his willingness to comply with all Medical Staff Bylaws, particularly with those articles of previous non-compliance.
 
 
 15
 b. [DiMarco] undergo psychiatric evaluation by an impartial source, with a report of the findings being sent to the Executive Committee of the Medical Staff.
 
 
 16
 c. [DiMarco's] probationary status be continued.
 
 
 17
 By decision of March 29, 1990, the hospital's appellate review committee agreed with the Fair Hearing Committee's conclusions, but modified the "punition" to eliminate the psychiatric evaluation and reduced the executive committee's imposition of a 90-day suspension to 30 days.
 
 
 18
 This action followed, in which DiMarco claimed that the hospital's actions violated due process as well as his first amendment rights. DiMarco also made claims for punitive damages under 42 U.S.C. § 1983, and attorney's fees under 42 U.S.C. § 1988. In a thorough, but unpublished, memorandum and order filed on June 29, 1991, Judge McAvoy addressed various parties' motions for summary judgment. He concluded:
 
 
 19
 (1) the hospital and the board of managers were acting under color of state law;
 
 
 20
 (2) there was insufficient evidence of an agreement between the private doctors and the state hospital to make their actions under color of state law (Judge McAvoy deferred the entry of judgment in favor of the doctor defendants, see Fed.R.Civ.P. 56(f), so that DiMarco could engage in additional discovery);
 
 
 21
 (3) the hospital and its board of managers could be held liable under § 1983, as they had final policymaking authority;
 
 
 22
 (4) as to disciplining DiMarco for his comments within the hospital, the court would defer a decision on all defendants' qualified immunity defense "until such time as it is in a position to understand more fully the nature of the animosity created by DiMarco's actions";
 
 
 23
 (5) DiMarco had not released the defendants from liability;
 
 
 24
 (6) as to DiMarco's due process claim, he had a property interest in neither his clinical privileges nor a "non-probationary status", thus, the defendants were entitled to summary judgment on this claim;
 
 
 25
 (7) as to DiMarco's first amendment claim, "the overall thrust of DiMarco's speech related to matters of public concern, as the record reflects that DiMarco continually expressed his concern for his patients' well-being and for the general workings of the Hospital";
 
 
 26
 (8) also as to DiMarco's first amendment claim, the court could not engage in the required Connick- Pickering balancing test at the summary judgment stage, because "[t]he amount of disruption that Dr. DiMarco may have caused and the impact his behavior had on his working relationships are complex issues that must be determined after listening to witnesses and after plaintiff has had an opportunity for cross-examination";
 
 
 27
 (9) because the first amendment portion of DiMarco's complaint "inherently involves findings of fact", it could not be made as a matter of law on the summary judgment record; and
 
 
 28
 (10) DiMarco's punitive damages claim was properly addressed "based on the evidence submitted at trial", and not on summary judgment.
 
 
 29
 All defendants appeal, bottoming our jurisdiction on the reviewability of denials of summary judgment based on qualified immunity, see Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The defendants, as well as the plaintiff, also appeal the other portions of Judge McAvoy's order, asking us to exercise our discretionary power of pendent appellate jurisdiction.
 
 DISCUSSION
 
 30
 Although the courts of appeals generally hear appeals only from "final decisions" of the district courts, see 28 U.S.C. § 1291, the Supreme Court has carved out a narrow class of interlocutory decisions ("collateral orders"), which are viewed as final decisions that are immediately appealable. Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). In Cohen, the Court explained that there is a "small class [of cases] which finally determine claims of right separable from and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." Id.
 
 
 31
 In Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court concluded that denials of summary judgments based on qualified immunity may fall within the Cohen "collateral order" exception, as qualified immunity "is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Id. at 526, 105 S.Ct. at 2815 (emphasis in original). The Court held that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291". Id. at 530, 105 S.Ct. at 2817.
 
 
 32
 The language in Mitchell v. Forsyth which is relevant to today's appeals is "to the extent that it turns on an issue of law". If qualified immunity can be determined as a matter of law, we can hear the appeal. If resolution of the immunity defense depends upon disputed factual issues, or upon mixed questions of fact and law, an immediate appeal will not lie, and review of the qualified immunity determination will have to await the district court's resolution of the factual questions. See, e.g., Kaminsky v. Rosenblum, 929 F.2d 922, 925-26 (2d Cir.1991); Langley v. Coughlin, 888 F.2d 252, 254 (2d Cir.1989); White v. Frank, 855 F.2d 956, 958 (2d Cir.1988); Mahoney v. Hankin, 844 F.2d 64, 68-69 (2d Cir.1988); Group Health Inc. v. Blue Cross Ass'n, 793 F.2d 491, 497 (2d Cir.1986), cert. denied, 480 U.S. 930, 107 S.Ct. 1566, 94 L.Ed.2d 758 (1987).
 
 
 33
 Judge McAvoy denied summary judgment on the issue of qualified immunity. This was necessary, Judge McAvoy thought, because DiMarco's first amendment claim implicated the fact-sensitive Connick- Pickering balancing test, see Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) and Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and qualified immunity could not be determined "until such time as [the court] is in a position to understand more fully the nature of the animosity created by DiMarco's actions."
 
 
 34
 We agree. The proper inquiry in this case is whether the law defined by Pickering, Connick, and the cases following them was "clearly established" on August 31, 1989, such that the defendants could reasonably have anticipated that their conduct would violate DiMarco's first amendment rights. More to the point, we must determine whether it would have been apparent, to reasonable people in the shoes of the defendants, that DiMarco's interest in expressing his views on quality of medical care outweighed the defendants' interest in the effective and efficient fulfillment of their responsibilities to the public. See Giacalone v. Abrams, 850 F.2d 79, 86 (2d Cir.1988). Because this inquiry contemplates a fact-sensitive evaluation of means and ends, and because the facts material to this inquiry are disputed, we cannot make a qualified immunity determination as a matter of law. Consequently, we lack jurisdiction and must dismiss the appeal.
 
 
 35
 To determine whether the plaintiff has a valid claim of retaliation for public speech, the district court must determine, first, whether the speech related to a matter of public concern. Connick, 461 U.S. at 150-53, 103 S.Ct. at 1691-93. If it did, the district court must then engage in a very subtle balancing test--the degree of public concern expressed by the speaker must be weighed against "the government's interest in the effective and efficient fulfillment of its responsibilities to the public". Id. at 150, 103 S.Ct. at 1692.
 
 
 36
 Thus, in order to determine that the defendants would be entitled to qualified immunity, we would, in effect, have to resolve the merits of DiMarco's first amendment claim, something we cannot properly do at this stage of the proceedings. Since the qualified immunity issue is "inextricably bound up with the merits" of DiMarco's claim, those merits should be determined first by the district court. Bolden v. Alston, 810 F.2d 353, 356 (2d Cir.), cert. denied, 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). The facts as developed at trial may show that DiMarco was so disruptive to the effective and efficient operation of the hospital that a reasonable and prudent hospital and staff could not have anticipated that their actions violated DiMarco's first amendment rights. Alternatively, the facts may show disruption so minimal that a reasonable and prudent hospital and staff would have to anticipate that disciplining DiMarco was in retaliation for protected speech. Since "the immunity question cannot be decided without addressing [DiMarco's] underlying claims on the merits," Group Health, 793 F.2d at 497, the claim of qualified immunity does not "turn[ ] on an issue of law", Mitchell, 472 U.S. at 530, 105 S.Ct. at 2817, and the appeal must be dismissed.
 
 
 37
 This is not to say that every Connick- Pickering claim will elude pretrial determination of qualified immunity. For instance, in Giacalone, we were able to assert jurisdiction and decide the issue, because no facts material to the qualified immunity defense were disputed: "Even accepting Giacalone's account of his dismissal," we there concluded that "the Pickering balance did not tip in his favor so clearly that his superiors can properly be said to have forfeited their qualified immunity." Giacalone, 850 F.2d at 86. Here, of course, our conclusion on qualified immunity will differ, depending on what version of the facts is ultimately established as true.
 
 CONCLUSION
 
 38
 We have considered the defendants' remaining arguments in favor of appellate jurisdiction, and we conclude that they are without merit. The appeals are dismissed. Having no basis upon which to exercise our pendent appellate jurisdiction, we dismiss the cross-appeal as well.