Jody CHEATWOOD, Danny Lee, Carol
Skinner, Rebecca Jenkins, and
Donald Wood, Plaintiffs,

v.

CITY OF OXFORD, Mayor Leon Smith,
(in his individual and official capacity);
Police Chief, Stanley Merrill, in his in-
dividual and official capacity, Defen-
dants.

No. CV–91–PT–2168–E.

United States District Court,
N.D. Alabama, E.D.

Feb. 4, 1992.

Lister Hill Proctor and Wanda Jo Wallace Batson, Sylacauga, Ala., for plaintiffs.

John R. Phillips, Phillips & Phillips, Ronald L. Allen, Merrill Merrill Mathews & Allen, Anniston, Ala., for defendants.

## MEMORANDUM OPINION

PROPST, District Judge.

Plaintiffs, current and former employees of the City of Oxford Alabama, Police Department, brought this action alleging that City officials had violated their constitutional rights through certain employment decisions. All of the defendants filed a Motion to Dismiss on October 3, 1991 which is currently pending before the court. The Motion was converted to a motion for summary judgment deemed submitted on January 6, 1992.[1] For the following reasons, the motion will be denied.

1. The motion was originally under submission on November 6, 1992. Defendant's original attorney withdrew because of an alleged conflict of interest. The submission date had to be rescheduled.

2. At the time the article was written, Jenkins was known by the name McKennon.

3. Plaintiffs' brief states that these three officers were later identified as plaintiffs Cheatwood, Wood, and Lee. However, the record doesn't indicate when and where these identifications were made.

## FACTS

The parties can agree on few facts in the instant case. The following represents a summary of these undisputed facts.

On September 23, 1990, the *Anniston Star* published an article entitled "Prisoners Say They Did Work for Chief". The article discussed allegations by Oxford police officers that prisoners serving time in the Oxford City Jail regularly performed yard work for Chief Stanley Merrill ("Merrill"). *See Brief in Opposition to Defendant's Motion to Dismiss*, Exhibit 1. The article, written by a Ms. Jena Heath, quoted plaintiffs Carol Skinner ("Skinner") and Rebecca Jenkins ("Jenkins").[2] The article also quoted three unidentified police officers.[3]

On March 24, 1991, the same reporter wrote an article in the *Anniston Star* entitled "Some DUI's Get off Easy in Oxford—Dropped Cases, Short Jail Stays are Routine."[4] The article reported that the City failed to prosecute 27% of the DUI[5] charges brought in Oxford in 1990. The article also reported that individuals sentenced to serve time in jail for DUI convictions were recorded as serving twice as many hours in jail as they actually served. The sources for the article, several unidentified police officers[6] and plaintiffs Skinner and Jenkins, identified defendant Merrill as the individual who was responsible for the City policy of failing to prosecute these offenders.[7] Mrs. Jenkins, who at the time of the article was employed as the Municipal Court Magistrate, stated in the article that Oxford's failure to separate the police system and the court system was the primary reason why Chief Merrill was able to

4. This article will henceforth be referred to as the March 24th article.

5. Driving under the influence of intoxicating substances.

6. Again, plaintiffs Cheatwood, Lee, and Wood assert that they were the sources quoted in the article.

7. One officer quoted in the article stated "I don't even pull that many people over any more because I'm going to get pulled into the chief's office or my supervisor's office and fussed at for writing a ticket for the wrong person."

exercise such influence on the number of DUI cases which were prosecuted.

On April 13, 1991, another article authored by Ms. Heath appeared in the *Anniston Star*.[8] Entitled "Smith Targets Police 'Leaks'", the article discussed a "closed-door" meeting of the Oxford City police department held by Mayor Leon Smith at City Hall.[9] The article quoted plaintiff Lee who stated that Smith wished to know which of the officers attending the meeting had spoken with the reporter who had drafted the article dealing with the City's treatment of DUI offenders.[10]

Immediately following the publication of the DUI article, the City made various changes in plaintiffs' employment situations. Plaintiffs claim that defendants made these changes to punish them for their interviews with the reporter who wrote the articles dealing with the City's treatment of DUI offenders and the alleged "leaks" in the police department. Defendants, of course, deny any connection between the changes and the articles. The following summarizes plaintiffs' version of the events surrounding the publication of the *Anniston Star* articles.

*Jody Cheatwood:*

Plaintiff Cheatwood was employed as a Sergeant with the Oxford Police Department since 1985. He had been employed as an officer since 1983. He was a shift supervisor. He also taught at the Northeast Police Academy. He claims that he had only received good evaluations for his work. *See* Affidavit of Jody Cheatwood, December 20, 1991.

Sergeant Cheatwood claims that he met with Ms. Heath, the *Star* reporter, and provided her with information from the public records regarding the dismissal of DUI cases. He states that he felt the people of Oxford were entitled to know what was transpiring in their police department since it was "unfair" that those who did not have connections with Chief Merrill or Mayor Smith had to pay their fines or serve their sentences for DUI convictions. Cheatwood Affidavit, at 2.

Cheatwood alleges that Mayor Smith approached him and defendant Lee on March 25, 1991, the day following the publication of the article dealing with the DUI offenders. Cheatwood states the Mayor "had a copy of the Sunday paper in his hand, and, as he slapped the paper against his hand he said, "I thought we had already discussed the matter about this kind of shit." When Lee and Cheatwood denied knowing anything about the article, the Mayor allegedly said "I will get to the bottom of this shit and I will have someone's damn ass for it." Cheatwood Affidavit at 2.

According to Cheatwood, the Mayor posted a notice on the police department bulletin board on April 11, 1991, notifying the department that all officers would be required to attend a meeting in the city council chambers that evening.[11] Cheatwood states that the Assistant Chief was posted at the door to assure that no one brought any recording devices into the meeting. At the meeting, the Mayor questioned all officers as to whether they had spoken with the reporter.[12] Plaintiffs Cheatwood, Wood, and Lee admitted to talking with the reporter. Affidavit, at 2.[13]

8. This article will be henceforth referred to as the April 13th article.

9. According to the article, Smith confirmed that the meeting had occurred.

10. In affidavits filed with the court, plaintiffs Cheatwood, Lee, and Wood state that they identified themselves as the officers who had spoken with the *Anniston Star* reporter regarding the DUI charges.

11. Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss states that the notice was posted on April 9, 1991 and the meeting held on April 10, 1991. The *Anniston Star* article indi-

cated that the meeting was held on April 11, 1991.

12. In Cheatwood's affidavit, he states that Mayor Smith made all the supervisory officers face the patrolmen. The Mayor then read the March 24 article. He then called Officer David Sparks to the front of the room and allegedly ordered him to "face his accusers". Mayor Smith questioned Officer Sparks regarding the article. Officer Sparks has confirmed this story. *See* Affidavit, David Sparks, December 26, 1991.

13. Apparently these three were the only police officers who admitted to interviewing with Ms. Heath. One other officer, David Sparks, states

Cheatwood states that the Mayor concluded the meeting with the statement, "I'm going to break up this little clique. This is phase one and phase two is beginning now. Make no mistake about it, gentlemen, I never forget who is for me and I sure as hell don't ever forget who is against me."

On May 13, 1991, Sergeant Cheatwood was fired from his position with the Oxford police Department. He claims that he was terminated because he gave the newspaper reporter information regarding the DUI convictions.

*Donnie Wood:*

Plaintiff Wood had been employed for 15 years as a policeman with the City of Oxford, serving the last ten years as a lieutenant. He had been the shift supervisor for the past ten years for the third shift.[14] *See* Affidavit of Donnie Wood, December 20, 1991. According to Lt. Wood, his shift was "the most efficient" in the department with no known morale problems.

Wood claims that he admitted to the Mayor that he spoke with the reporter from the *Anniston Star* regarding the DUI prosecutions. *See* Wood Affidavit, at 2. Wood also stated that he believed the Mayor and Chief Merrill knew which officers had spoken with the paper.

Wood also alleges that defendants Merrill and Smith had retaliated against him for discussing the DUI incidents with the paper. For example, Wood broke his ankle playing softball about the time he met with Ms. Heath. According to Wood, the Mayor and the Chief would not permit him to return to light duty work because of his injury, thereby requiring him to use up his sick days.[15]

Wood also claims that defendants retaliated against him by transferring him from the third shift to the first shift without notice or questioning.

*Danny Lee:*

Lieutenant Danny Lee had been employed by the Oxford Police Department for fifteen years. He served as the Lieutenant of the first shift from November, 1990 through April 22, 1991. According to plaintiff Lee, his shift was efficient and he had a good relationship with his officers. *See* Affidavit of Danny Lee, December 22, 1991.

Lee states that Mayor Smith was aware that he was one of the police officers who had given an interview to the *Anniston Star* reporter.[16] He also provides a description of the April 11 police officers' meeting which essentially parallels Cheatwood's and Wood's.[17]

On April 22, 1991, Lee claims that he received a notice of transfer to the third shift. He claims that this transfer was made in retaliation for his having spoken with the press.

*Carol Skinner:*

Plaintiff Carol Skinner was hired as a police clerk for the City of Oxford in 1983. She had previously worked with the Police Department as an officer since 1977. Ms. Skinner worked a thirty hour week and received health insurance benefits and paid leave. She was also eligible to purchase insurance for her family through the City's group policy.

Ms. Skinner states that, as Police Clerk, she was familiar with DUI arrests and

---

that he spoke with the reporter but did not admit it at the meeting because he was afraid of what the Mayor would do. *See* Affidavit of David Sparks, December 26, 1991.

**14.** The third shift lasted from 11:00 p.m. to 7:00 a.m.

**15.** According to Wood, it was common for injured officers to work a light duty shift. Wood Affidavit.

**16.** Lee claims that the day after the publication of the March 24 article, defendant Smith approached him and Sergeant Cheatwood stating,

"I thought this shit was not going to happen again. I'm going to get to the bottom of this and I will get somebody's ass. I know you two are involved." Sergeant Cheatwood's account of this incident was substantially the same.

**17.** According to Lee, following the meeting, the Mayor posted a notice in the police department stating that henceforth the record room would be locked and those who wished to enter needed to sign a log.

sentences for this offense. She believed that the City's practice of dismissing DUI charges was "unfair" and that the citizens were entitled to know of the City's alleged illicit practices. *See* Affidavit of Carol Skinner, December 20, 1991.

On March 3rd and 6th, Ms. Skinner states that she met with Jena Heath, the *Anniston Star* reporter. Ms. Skinner claims that she showed the reporter the jail logs and the police records. She states that the Mayor and Chief Merrill were aware of her meetings with the reporter and they consequently began to behave in a "very cool" manner towards her.[18]

On March 19, 1991, Chief Merrill gave Ms. Skinner a letter notifying her that her workweek would be cut to 28 hours per week. As a result of this decrease, Skinner's status changed to that of a part-time employee. She allegedly approached Chief Merrill regarding the cutback and was told "It was an executive decision, and I don't need to discuss it with you." She then approached the Mayor to ask him whose idea it was to reduce her hours. Smith allegedly stated, "it was an administrative decision and why should I tell you names." Skinner Affidavit at 3.

Ms. Skinner subsequently requested a hearing before the Oxford Civil Service Board which was denied. The Board informed her on April 25, 1991 that the reduction in hours was not a Board matter. Letter from Ellis Craven to Carol Skinner, April 25, 1991.

Skinner claims that the City reduced her work hours to retaliate for her interviews with the newspaper so that she would not be able to receive the benefits of a full-time employee. She resigned her position as police clerk on June 6, 1991.

*Rebecca Jenkins:*

Plaintiff Jenkins held the official title of Police Clerk for the City of Oxford. However, she claims that in actuality she also functioned as the Court Clerk.[19] In support of this assertion, she submits an Oath of Office, dated March 8, 1988, in which she was sworn in as Court Magistrate/Clerk. She has also submitted an employee evaluation in which Chief Merrill referred to her as Court Clerk. *See* City of Oxford Employee Evaluation. She also allegedly attended seminars and conferences for court magistrates.

In early 1991, Jenkins approached Mayor Smith about creating a separate position as Clerk of the Court, thereby separating the court from the police department. Smith allegedly responded, "It is not in this year's budget to create a new position. No more money than it brings in—I've been thinking about sending all of the city court cases to the district court."

Along with the other plaintiffs, Jenkins met with the *Star* reporter and provided her with information regarding the dismissal of DUI cases in Oxford. She states that several days before the publication of the article on March 24, Mayor Smith came into her office in City Hall, wishing to know how the reporter obtained copies of the city court records. Jenkins, stating that she feared the Mayor, claimed she didn't know. Smith then allegedly approached her in a threatening manner, saying "You're not lying to me, are you?" Jenkins stated that at this time the City changed the lock to the court record file room. Jenkins affidavit, at 3.

Following the publication of the March 24 article, the Mayor allegedly came into Ms. Jenkins' office to speak with her. Referring to the article, which discusses the court clerk duties which Jenkins performed, Smith allegedly said, "I want you to know that you just think you are Court Clerk. If you were appointed Court Clerk then you can be un-appointed." Jenkins affidavit, at 3.

In addition, she claims that although her position was classified as police clerk, the qualifications for this position dealt with duties around the municipal court. Affidavit of Rebecca Jenkins, December 22, 1991.

---

18. In her affidavit, Skinner states that the reporter came to her office at least twice to get information concerning the DUI cases from her.

19. In her affidavit, Ms. Jenkins claims that Mayor Smith and Chief Merrill assigned her to the position of court clerk on February 26, 1991.

Following the publication of the April 13 article, Jenkins was contacted by Mayor Smith. Mayor Smith allegedly told her, "You remember me telling you not to be making copies of the court records for the reporter? You defied me, didn't you? What have you been mailing to her".[20] Mayor Smith then allegedly informed Jenkins that "[y]ou can be sure that your job is going to be separated from the court."

Jenkins states subsequently that Mayor Smith "and/or" Chief Merrill asked that the City Civil Service Board establish a new position as Court Magistrate. They requested that the Board give an open test for the position. Ms. Jenkins wrote defendant Merrill, asking that he request the Board to give an "in-house" test. Merrill did not respond to this letter. Instead, the Board responded to Ms. Jenkins' letter, stating that the Board had decided not to give an "in-house" test. See Letter from Oxford Civil Service Board to Becky Jenkins, May 28, 1991. Jenkins next received a letter from the City attorney which stated that "the municipal court must be completely detached from the police department and it would not be proper for the department head to make any recommendation."

On June 24, 1991, Ms. Jenkins resigned her position with the court. She claims that she was constructively terminated since the Mayor and Chief Merrill subjected her to poor treatment, monitored outgoing mail, and abolished the job she had held following her interview. Brief in Opposition to Defendants' Motion to Dismiss at 7.

On September 13, 1991, plaintiffs filed a complaint in this court. They allege that the aforementioned personnel changes infringed plaintiffs' First Amendment rights, in violation of 42 U.S.C. § 1983.[21] They seek relief in the form of attorney fees and punitive damages.

Defendants' version of the personnel changes in the Oxford Police Department differs substantially from that of the plaintiffs. The following represents a summary of defendants' presentation of the facts.
*Jody Cheatwood:*

Defendants claim that Sergeant Cheatwood was terminated following an investigation of remarks which he made to fellow officers regarding one Officer Lisa Weathers. *Supplemental Brief of Defendants*, at 2. According to defendants, in January, 1991, Cheatwood was standing with some Oxford police officers in the Police Department parking lot discussing an accident in which Officer Weathers had recently been involved. Sergeant Cheatwood allegedly remarked to the officers, "You people are the ones that can get her hurt, Like if she needs a backup unit just take your time." *See* Defendant's Brief in Support of Motion for Summary Judgment.[22] Officer Weathers apparently learned about this conversation in April at which time she wrote a letter concerning it to Chief Merrill. *See* Letter to Chief Merrill and Mayor Smith, from Lisa Weathers, April 15, 1991.[23]

Defendants claim that they subsequently began an "intense" investigation of the matter with "sworn statements being made

---

**20.** Ms. Jenkins allegedly informed the Mayor that Chief Merrill had instructed her to mail to the reporter only the court record information when there was a DUI conviction.

**21.** 42 U.S.C. § 1983 states, "Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

**22.** To support this assertion, defendants have attached copies of five hand-written statements

from the members of the Department who were allegedly present when Cheatwood made his remarks. None of them are sworn. *See* Statement of Steven Palmer, April 14, 1991; Statement of L.G. Owens, April 14, 1991; Statement of Bill Partridge, April 14, 1991; Statement of Dexter Holcomb, April 14, 1991; Statement of Baron Reaves, April 22, 1991.

**23.** Prior to Cheatwood's alleged comments in the parking lot which concerned her, Ms. Weathers had apparently commenced a suit against various members of the department. Sergeant Cheatwood was one of the named defendants. The record does not indicate the nature of the suit.

by law enforcement officers supporting that the threats had been made by Cheatwood." Affidavit of Mayor Leon Smith, October 17, 1991.[24] The results of this investigation allegedly led to Officer Cheatwood's termination. Defendants also assert that Cheatwood appealed his termination at a hearing held before the Oxford Civil Service Board. At the hearing, Cheatwood apparently admitted that he had made certain statements with regard to not responding to backup calls by Officer Weathers. Supplemental Brief of Defendants, at 2; Transcript of Proceedings before the Oxford Civil Service Board, at 191.[25] Sergeant Cheatwood's termination was evidently upheld at the hearing. This decision is currently on appeal to the Circuit Court of Calhoun County.

In summary, defendants claim that Officer Cheatwood's termination was the result of his statements and conduct directed towards Officer Weathers. *Donnie Wood and Danny Lee:*

Defendants claim that Officers Lee and Wood were transferred to different shifts within the Police Department to improve efficiency and performance within the department. *See* Smith Affidavit.[26] They assert that these transfers had nothing to do with plaintiffs' statements to the newspapers.[27]

*Carol Skinner:*

Concerning plaintiff Skinner, defendants deny that her hours were reduced to retaliate for her remarks to the *Star.* Instead, the Police Department cut back her hours because it had installed a new computer system which produced less work for her. Brief in Support of Motion for Summary Judgment, at 3. Moreover, defendants aver that Ms. Skinner suffered no unconstitutional deprivation since she had seldom worked a thirty-hour week for the year prior to her leaving her employment. *See* Affidavit of Alton Craft, January 6, 1991.[28]

*Rebecca Jenkins:*

As to Ms. Jenkins, defendants assert that she was not unlawfully required to take a test to retain her current position. Instead, defendants claim that a new position of Court Magistrate was created which the Civil Service Board decided to fill through an open examination rather than an in-house test. Merrill Affidavit at 2. Since Ms. Jenkins did not take the test, she was not eligible for consideration as a court Magistrate.

## LEGAL CONTENTIONS

In their complaint, plaintiffs allege that their interviews with the *Anniston Star* reporter were constitutionally protected under the First Amendment. They further claim that this conduct was a substantially motivating factor in the defendants' adverse employment actions and that defendants' justifications for taking these actions are false.

Plaintiffs claim that the four-step analysis set forth in *Bryson v. City of Waycross*, 888 F.2d 1562 (11th Cir.1989), reh. den., en banc, 894 F.2d 414 (1990) applies in cases such as this where the governmental employer denies discharging the employee because of speech. First, the

---

24. The only evidence which Mayor Smith has offered of the "intense" investigation are the five statements of the police officers which are not sworn.

25. In their brief, defendants assert that Officer Cheatwood's termination hearing was fully documented. However, defendants have not seen fit to submit any of this documentation to this court, other than the portion of Cheatwood's testimony in which he admits to making the statements about Officer Weathers. There is no evidence that Cheatwood made any First Amendment denial claim before the Civil Service Board or that the said Board considered such a claim. If there had been such consideration, *res judicata* might be a concern here.

26. In a deposition, Chief Merrill stated that the transfers were ordered to eliminate some discontent in the department. Deposition of Stanley Merrill, December 12, 1991.

27. Chief Merrill indicated that there was some "disgruntling" among people in the department which led to his decision. Merrill deposition, at 201.

28. The payroll copies attached to Mr. Craft's affidavit also indicate that prior to 1984, Ms. Skinner worked 20 hours per week. Defendants' brief fails to explain the relevance of this information.

court must determine if the employee's speech may be "fairly characterized as constituting speech on a public concern." *Bryson*, 888 F.2d at 1565, (quoting *Rankin v. McPherson*, 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987). In making this inquiry, the court must examine the content, form, and context of the employee's speech to determine if it addresses a matter of public concern. *Rankin*, 483 U.S. at 384–385, 107 S.Ct. at 2896–2897. In the instant case, plaintiffs assert that plaintiffs' interview with the *Star* reporter dealt with a matter of public concern-the City of Oxford's treatment of those charged with driving while under the influence of alcohol or controlled-substances.[29]

■ If the speech addresses a matter of public concern, the court's next step is to apply a balancing test set forth in *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). In applying this balancing test, the court must weigh the employee's First Amendment interests against "the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees". *Id.* In making this determination, the court must again consider the context and circumstances of the employee's speech. Plaintiffs here assert that the alleged rationales of the employment changes were all pretextual.[30]

■ If the employee prevails on this balancing test, the third step in this inquiry is reserved to the fact-finder who must determine if the speech played a "substantial part" in the government's decision. *Mt.*

*Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).[31] Here, plaintiffs assert that this prong is satisfied, inasmuch as defendants "threatened, harassed, discharged, transferred, denied light duty work, and constructively discharged plaintiffs following their interviews with the *Star* reporter." Complaint.

Should the employee succeed in showing that the speech was a substantial motivating factor in the employment decision, the state must prove by a preponderance of the evidence that "it would have reached the same decision ... even in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 286, 97 S.Ct. at 575.

Defendants respond to these allegations that they deprived the plaintiffs of their rights in the following manner. As previously discussed, they deny that any of the changes were motivated by a desire to suppress plaintiffs' speech. In addition, defendants assert that plaintiffs Skinner and Jenkins were not deprived of any constitutionally-protected right since they resigned their positions. Moreover, Officers Lee and Wood's transfers to different shifts did not constitute any deprivation of a job position, pay, or benefit. In making this contention, defendants rely on the proposition, set forth in *Maples v. Martin*, 858 F.2d 1546, 1550 (11th Cir.1988) that transfers and reassignments generally do not constitute a constitutionally protected property interest.[32]

Defendants also contest plaintiffs' argument that the four part test for determining if a public employee's speech is protect-

---

**29.** Plaintiffs point to § 32–5A–191 Ala.Code (1975) which prohibits driving under the influence of intoxicating substances. The commentary to this statute states, "The purpose of the section is ... to make DUI statutes more enforceable and to do a better job of helping identify the problem of the drinking driver and to keep him off the highway."

**30.** In support of this assertion, plaintiffs utilize the example of the Wood and Lee transfers. By the admission of Chief Merrill, both Lee and Wood had been good shift supervisors. Merrill deposition at 206, 211. Nonetheless, they had allegedly been transferred because of personnel

problems. However, after they were transferred, no further changes in the operation of the shift were ordered.

**31.** In their brief, plaintiff states that this determination is for the court to make.

**32.** In arriving at this conclusion, defendants appear to presume that plaintiffs have complained of a violation of due process. However, plaintiffs' complaint asserts a deprivation of the First Amendment right to freedom of expression and not a due process violation. A protected "property" interest is not a required element in proving such a violation.

ed by the First Amendment has been satisfied in the instant case. Defendants allege that plaintiffs' discussions with the *Star* reporter did not satisfy the second prong of this analysis-namely the *Pickering* balancing test. Specifically, defendants contend that plaintiffs' speech was not protected by the First Amendment since "the basis of each and every administrative decision was to ensure the efficient and harmonious running of the police department." Defendants' Brief in Support of the Motion for Summary Judgment at 6.

■ In addition, defendants claim that they are protected by the doctrine of "qualified immunity".[33] This doctrine protects government officials acting within a discretionary capacity from individual civil liability so long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Courson v. McMillian*, 939 F.2d 1479, 1486 (11th Cir. 1991) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■ *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir.1988) provides the analysis utilized in this circuit for determining if officials are entitled to qualified immunity. First, the public official must prove that he was "acting within the scope of his discretionary authority when the allegedly wrongful act occurred." Once the official satisfies this burden, the plaintiff must show lack of good faith on the part of the defendant. This burden is met by proof that the defendant's actions "violated clearly established constitutional law." Concerning the first prong, the public official proves that he acted within his discretionary authority by showing "objective circumstances which would compel the conclusion that this actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Rich*, 841 F.2d at 1564.

■ The second prong of the *Rich* test is divided into two parts. The reviewing court must first decide if the applicable law was clearly established when the alleged government action occurred. *Id.*[34] Second, the court must determine if there is a genuine issue of fact concerning the government official's conduct being in violation of clearly established law.

■ The court notes that defendant the City of Oxford has not raised the issue of whether its alleged conduct towards plaintiffs was the consequence of an official policy adopted by the City. It is well established that § 1983 liability may only be imposed upon municipal governments for their own unconstitutional or illegal official policies. *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality cannot be held liable under a *respondeat superior* theory. Since it has not been raised, the court will not address this issue.

## LEGAL CONCLUSIONS

■ Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where there exists no genuine issue as to any material fact and where the movant is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[The] mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247, 106 S.Ct. at 2510. As the Supreme Court noted in *Anderson*, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party . . . If the evidence

**33.** Qualified immunity must be plead as an affirmative defense. *Harlow*, 457 U.S. at 815, 102 S.Ct. at 2736.

**34.** Courts have defined "clearly established" as meaning that "the contours of the right must be

sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

is merely *colorable* ... or is not *significantly probative* ... summary judgment may be granted." *Id.* at 250, 106 S.Ct. at 2511. [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. Rule 56(e) requires the nonmoving party to go beyond the pleadings and "by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553.

This court must, therefore, examine the instant facts, in the light most favorable to the plaintiff, to determine if there exists "a genuine issue of material fact." *Anderson, supra*, 477 U.S. at 248, 106 S.Ct. at 2510.

▆ In the instant case, the gravamen of the plaintiffs' complaint is that the defendants retaliated against them for exercising their First Amendment rights by speaking with the *Star* reporter and providing her with information. It is well-established that § 1983 has been utilized to litigate such claims. *See e.g., Bryson v. City of Waycross*, 888 F.2d 1562 (11th Cir. 1989). Therefore, plaintiffs' claims must be analyzed according to the four-step test set forth above in *Bryson.* The first step in the court's inquiry is whether the speech deals with a matter of public concern.[35] The court concludes that it does. Plaintiffs' discussions with the *Star* reporter dealt with alleged misconduct by government officials in the prosecution of DUI charges and the use of prisoners to perform labor at Chief Merrill's house. This court has previously held that "a core con-

cern of the First Amendment is the protection of the Whistle blower attempting to expose government corruption." *Bryson*, 888 F.2d at 1566.[36] *See also Connick v. Myers*, 461 U.S. 138, 148, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983) (the bringing to light of actual or potential wrongdoing or breach of public trust on the part of public officials is a matter of public concern.)

The second prong in the *Bryson* analysis is the *Pickering* balancing test in which the court weighs the employees' interests against the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. *Bryson*, 888 F.2d at 1566. In balancing these interests, the court must consider factors which include "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently (2) the manner, time, and place of the speech (3) and the context within which the speech was made." *Morales*, 848 F.2d at 1149.

The first matter to be considered in applying the *Pickering* test is the extent to which the plaintiffs' interviews with the *Star* reporter impeded the Oxford Police Department's ability to perform its duties efficiently. In making this determination the court is mindful that "the state's interest in regulating its police force is especially compelling." *Waters v. Chaffin*, 684 F.2d 833, 836 (11th Cir.1982). *See also Williams v. Board of Regents*, 629 F.2d 993, 1003 (5th Cir.1980) ("[d]iscipline is a necessary component of a smoothly-operating police force.")

In considering whether plaintiffs' speech impeded the City's ability to perform its duties efficiently, the court must "examine whether the speech impairs discipline by superiors or harmony among co-workers or has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary." *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899. While

---

**35.** In their briefs, defendants do not contest that plaintiffs' speech addressed a matter of public concern.

**36.** *See also Morales v. Stierheim*, 848 F.2d 1145, 1149 (11th Cir.1988), *cert. den. Leon v. Avino*,

489 U.S. 1013, 109 S.Ct. 1124, 103 L.Ed.2d 187 (1989) (bringing to light an "actual or potential wrongdoing or breach of public trust" constituted a matter of public concern.

denying that any of the employment decisions were motivated by plaintiffs' speech, defendants argue the "basis of each and every administrative decision (at issue) was to ensure the efficient and harmonious running of the police department." Brief in Support of Motion for Summary Judgment at 6. For example, Cheatwood was allegedly terminated because of his remarks concerning Officer Weathers. Skinner's hours were allegedly reduced because of the new computer system. In addition, Chief Merrill stated that he transferred Officers Wood and Lee to resolve some personnel problems in the department.[37] Jenkins had performed the duties of court magistrate and had even been sworn in as a magistrate. However, the Mayor decided to create the position of court clerk because it was his opinion that "the municipal court system should undergo some change". Affidavit of Leon Smith, October 17, 1991.

The court agrees that the Oxford Police Department and Chief Merrill have a "substantial interest in developing discipline, esprit de corps, and uniformity ... to insure adequate promotion of safety of persons and property." *Kelley v. Johnson*, 425 U.S. 238, 246, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976). In the instant case, the affidavits of Mayor Smith and Chief Merrill fail to show that the employees' speech actually disrupts the officers' efficiency or the internal operation of the Department or even that it has the reasonable tendency to lead to such disruption. *Waters*, 684 F.2d at 839. Here, the sole evidence tending to show that plaintiffs' speech may have disturbed the "harmony and discipline" of the Department is Chief Merrill's somewhat

vague testimony regarding the "disgruntlings" in the Department and the fact that he did not hear as much "rip-rap" following the officers' transfer and Cheatwood's termination as well as defendants' assertion in their brief that all administrative decisions were taken to "insure the efficient and harmonious running of the police department." Merrill deposition at 263; Brief in Support of Motion for Summary Judgment. Moreover, defendants have not suggested that plaintiffs occupy confidential, policy-making positions which may have been compromised by their statements.[38]

The situation in the instant case is thus distinguishable from that in *Bryson v. City of Waycross*. In *Bryson*, the officer alleging the violation of his First Amendment rights had complained about the Department's operation to all in the Department. Moreover, several witnesses testified that his activities in investigating the corruption of the Chief Officer undermined the morale of the Police Department.[39] There is no such indicated disruption here. Under the first prong of the *Pickering* test, therefore the court concludes that the government's interests do not outweigh plaintiffs' speech interests.

The second criteria which this court must consider in the *Pickering* balancing analysis is the time, manner, and place of the speech. *Bryson*, 888 F.2d at 1567. It is not clear from the evidence which has been submitted to the court whether the employees met with the *Star* reporter at the offices of the police department or elsewhere; it is also unclear whether the employees were off-duty or working at the time of the

---

**37.** Specifically, Chief Merrill indicated that Officers Lee and Wood had been troubled by the hiring of an Assistant Chief from outside of the Department and therefore encouraged "disgruntling" in the Department among other officers. Merrill deposition at 199. In his deposition, Chief Merrill stated that this "disgruntling" took the form of "general people in the Department being asked to do this or asked to do that". He also stated that "Lieutenant Lee and Lieutenant Woods had talked to some of the other people that I named (other officers) and others was getting involved to the point that I felt like that the personnel problems—and they should be

transferred to try to run a more effective Police Department." Merrill deposition at 202.

**38.** *See e.g., Rankin,* 483 U.S. at 391, 107 S.Ct. at 2900. "Where, as here, an employee serves no confidential policy-making, or public contact role, the danger to the agency's successful function from that employee's private speech is minimal."

**39.** Several witnesses even testified that officers chose to avoid the station house because of the rancor between Bryson and some of the other officers. *Bryson,* 888 F.2d at 1567.

interviews.[40]

Defendants do not allege and the evidence does not reveal that the tenor of plaintiffs' discussions with the newspaper was rude or derogatory about the police department or the Mayor. This distinguishes the instant case from the situation which this court faced in *Dartland v. Metropolitan Dade County*, 681 F.Supp. 1539 (S.D.Fla.1988), rev'd on other grounds, 866 F.2d 1321 (11th Cir.1989). In *Dartland*, an employee had called a fellow government official a "paid lackey" in a newspaper interview. The court found that this speech was not protected by the First Amendment because of its rude and insulting character.

In the absence of evidence that plaintiffs' speech was rude or derogatory or that they had improperly used police department time or facilities to speak with the reporter, this court cannot conclude that the manner, time, and place of plaintiffs' speech was improper. *See e.g., Bryson*, 888 F.2d at 1567 (Officer spent police department time "broadcasting his rancor").

The third and final criteria to be weighed in the *Pickering* analysis is the context within which the speech is made. *Bryson*, 888 F.2d at 1567. Defendants suggest that defendants' interviews may have been motivated by some personnel problems within the Department. For example, defendants suggest that Officers Lee and Wood may have been disturbed by the fact that the Department had hired an assistant chief from outside of the department. *See* Merrill deposition at 199. However, there is no other evidence that the plaintiffs' actions in speaking with the reporter may have been

motivated by the desire for personal gain or because of some animus concerning a hiring decision.[41] *See e.g., Bryson*, 888 F.2d at 1567 (context of Bryson's speech concerns an ongoing personal dispute with a supervisor).

The court also notes that, with the possible exception of Officer Cheatwood, the evidence does not indicate that the department's interests were compromised to such a degree as to require the dismissal of the employees. Instead, the plaintiffs were permitted to retain their positions with some changes. This distinguishes the instant case from the situation in *McDaniel v. Woodard*, 886 F.2d 311 (11th Cir.1989). In *McDaniel*, the court upheld the dismissal of a circuit judge's private secretary who alleged that she had been unlawfully terminated after providing information to a prosecutor investigating a case. The judge, her supervisor, had cautioned her not to assist the attorney since he feared the appearance of entanglement with the prosecutorial function. This court held that the secretary's First Amendment interests did not override the judge's interests in retaining a loyal, confidential assistant and in maintaining an appearance of impartiality in the chambers. In the instant case, despite defendants' alleged interests in maintaining a harmonious, efficient police department, most of the plaintiffs were permitted to retain substantially the same positions.

After applying the *Pickering* balancing test to the circumstances in the instant case, the court concludes that the City's interests do not outweigh the employees' speech interests.[42]

---

40. Ms. Skinner did state in her affidavit that the reporter came to her office at the City Hall at least twice to review jail logs and police records. Skinner Affidavit, at 2. The evidence does not indicate whether the showing of records to the public is consistent with Ms. Skinner's duties as a police clerk. Apparently, it would. Further, it would be consistent to talk to reporters about such records.

41. Indeed, plaintiffs Skinner and Jenkins were not police officers and thus could not be deemed to have been motivated by any anger or disappointment at not having been appointed to the position of assistant chief.

42. The third prong in this four step analysis is determining if the employees' speech played a substantial part in the government's employment decision. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). This determination is reserved to the fact-finder. Should plaintiffs succeed in demonstrating this, the defendants must prove that they would have reached the employment decisions despite the speech.

Having concluded that plaintiffs' speech is entitled to constitutional protection, the court will next address defendants' dual contentions that plaintiffs were not deprived of any constitutionally protected rights and that defendants are entitled to qualified immunity. First, the court notes that plaintiffs do not purport to assert a claim for any due process violation. Therefore, this court need not examine whether plaintiffs were deprived of any constitutionally protected interest.[43] Plaintiffs instead assert that defendants *retaliated* against them for exercising the constitutionally protected right of free speech. It is well-established that such a claimant need not show that such retaliation took the form of a deprivation of a constitutionally-protected interest or right. Instead, the retaliation may consist in the deprivation of any non-trivial position or privilege because the individual engaged in protected activity. *See e.g., Rutan v. Republican Party*, 497 U.S. 62, 110 S.Ct. 2729, 2746, 111 L.Ed.2d 52 (1990) (holding that the fact that plaintiffs had no legal entitlement to transfer, promotion, or recall was "besides the point".) *Georgia Ass'n Of Educators v. Gwinnett County School Dist.*, 856 F.2d 142, 145 (11th Cir.1988) (holding that the denial of the privilege to "checkoff" union dues could constitute retaliation for First Amendment activity). Therefore, it is irrelevant that, with the possible exception of Officer Cheatwood, none of the other plaintiffs has alleged the loss of a constitutionally protected property interest.

Whether the alleged employment actions, consisting of Cheatwood's termination, Lee and Wood's transfers, Skinner's reduction in hours, and the creation of a separate court clerk position to replace Jenkins are non-trivial claims is a question of fact. There is evidence that both Officers Lee and Wood were content and functioning well on their previous shifts and that Skinner lost employment benefits due to her reduction in hours. When the evidence is construed most favorably to plaintiffs, the non-movants, it raises disputed issues of fact.

The court next turns to the qualified immunity defense asserted by Merrill and Smith.[44] The Supreme Court formulated the doctrine of qualified immunity in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Under this doctrine, government officials are shielded from suit unless the court is convinced that the "legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions, ... or the law clearly proscribed the actions the defendant ... took." The burden is on the plaintiffs to show that the "defendants' actions violated clearly established constitutional law." *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir.1983). This burden cannot be met by making "general conclusory allegations of a constitutional violation or by stating broad legal truisms." *Dartland v. Metropolitan Dade County*, 866 F.2d 1321, 1323 (11th Cir. 1989).

In determining if an official is entitled to immunity, the court must conduct a two-step analysis. In the first step, defendants must prove that they were acting within the scope of their discretionary authority when they terminated plaintiffs. In the instant case, there is no dispute that defendants were acting within the scope of their discretionary authority when they took these employment actions. *See Stewart v. Baldwin County Bd. of Educ.*, 908 F.2d 1499, 1503 (11th Cir.1990). Therefore, the court need only address the second part of the test-whether the legal norms allegedly violated by defendant were clearly established at the time defendants' alleged conduct occurred. If the law that defendants allegedly violated was not clearly established, then defendants are entitled to qualified immunity. *Rich*, 841 F.2d at 1564. If the legal norms that defendants allegedly violated were clearly established

---

**43.** *See e.g., Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).

**44.** This defense is available only to the officials and not to the City. *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

when defendants' conduct occurred, the court must determine if the plaintiff has adduced evidence sufficient to create a genuine issue of fact as to whether the defendant engaged in conduct violative of the rights guaranteed by clearly established law. *Stewart*, 908 F.2d at 1503.

Prior decisions provide guidance as to whether defendants' actions violate clearly established constitutional rights. An official will be immune if the applicable law was unclear or if a reasonable officer could have believed that his actions were lawful in light of the clearly established law and the information possessed by the officer. *McDaniel v. Woodard*, 886 F.2d at 314. The inquiry is fact-specific—"in light of preexisting law, the unlawfulness must be apparent." *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3040. Using this standard, the court must determine, whether, using plaintiffs' version of the facts, the defendants could have reasonably believed that these personnel decisions were lawful in light of the clearly established law.

As previously discussed, plaintiffs' speech on the City's handling of DUI charges implicates a matter of public concern. In addition, the court has already determined that plaintiffs' speech interests outweigh any interest articulated by the City in the efficient and effective operation of the police department. Defendants cannot point to any inefficiency, disruption, or ineffectiveness in the workplace that was caused by plaintiffs' speech. The manner of plaintiffs' message was not rude and insulting. Therefore, the court concludes that defendants could not reasonably have believed that any adverse personnel action taken against plaintiffs' in response to the newspaper interviews could be constitutional.

The court next turns to the final issue of whether there is a genuine issue of material fact as to whether defendants acted so as to deprive plaintiffs of their constitutional rights. Defendants maintain that the employment changes were motivated by other factors which have previously been discussed. However, plaintiffs have produced evidence, in the form of their own affidavits and Chief Merrill's deposition, that support their contentions that defendants' reasons for the employment changes were pretextual. Cheatwood, for example, was allegedly terminated following an investigation stemming from certain remarks which he made to Officer Weathers. However, Chief Merrill acknowledged that there were some inconsistencies in his testimony concerning Cheatwood's termination. For example, defendants' brief stated that Cheatwood had been terminated following an "intense" investigation with sworn statements from five officers. None of these statements was sworn; moreover, defendants have presented no other evidence of the investigation of Cheatwood's alleged misconduct.[45] As to plaintiffs Wood and Lee, Merrill stated that they had been transferred to resolve problems in the department. However, the Chief stated that their performance had generally been satisfactory prior to their transfers and that there had been no significant problems with their shifts. Merrill deposition at 198.

The purported reason for the cutback in Ms. Skinner's hours was the coming on line of a new computer system. However, Chief Merrill stated that as of December, 1991, nearly six months after the reduction in hours, the system was still not functioning. Merrill Deposition at 133. Ms. Jenkins had allegedly performed the duties of the court clerk as well as police clerk and had approached the Mayor about creating a separate clerk of court position. The Mayor allegedly claimed that it was not in the budget. However, he subsequently developed the opinion that a separate position should be created following the publication of the articles.

Plaintiffs Cheatwood, Jenkins, and Lee all testified that the Mayor had approached them to express his displeasure with the interviews. Wood has confirmed that a meeting took place at which the Mayor

---

**45.** In any event, when the termination followed on the heels of the protected speech, this court cannot determine, as a matter of law, what motivated the employment decisions; particularly when considered in the light of the decisions with respect to all the plaintiffs.

allegedly threatened those who had spoken with the reporter. Skinner stated that the Mayor and Chief Merrill had become "very cool" to her after they learned of her interviews with the reporter. It was not long afterwards that her hours were reduced.

The court concludes that plaintiffs have presented sufficient evidence from which a jury could find that these personnel actions were taken in retaliation for plaintiffs' exercise of their clearly established constitutional rights. Therefore, summary judgment is inappropriate.[46]

For the foregoing reasons, defendants' motion will be denied.

---

**46.** While the law with reference to "matters of public concern," *Pickering* balance and qualified immunity has become severely muddled in recent years, this court does not believe that *all* issues have been removed from finders of fact. Although many considerations of qualified immunity have the appearance of considerations of the merits, this court does not feel free to decide all cases at the summary judgment stage. While the Eleventh Circuit has held that all qualified immunity issues are questions of law, they are often difficult to separate from the facts. It may be inconsistent to say that "affirmative defense" issues are always to be resolved as a matter of law if the facts are in dispute. *Cf. White v. Walker,* 950 F.2d 972 (5th Cir.1991). Although the Eleventh Circuit has suggested that *Pickering* issues are also questions of law, they are also factual in nature. *Cf. Di Marco v. Rome Hosp. and Murphy Mem. Hosp.,* 952 F.2d 661 (2d Cir.1992).